Good morning, your honors. May it please the court, my name is Robert Freeman. I'm a lawyer in Las Vegas, Nevada. Here I represent the appellants. Could you speak up a little bit? I'm sorry, of course I can. My name is Robert Freeman. I represent the appellants in this case. The appellants are members of the City of North Las Vegas SWAT team. The appellants, as part of that SWAT team, were called in July of 2011 to assist in a police operation in the City of Henderson. They were called to assist by the City of Henderson Police Department and the City of Henderson SWAT team. The North Las Vegas SWAT team dutifully responded to that request. They were told on-site that the situation was a barricade hostage situation. But it wasn't. Well, I mean, the guy was refusing to come out of his house. He had his infant. It was later determined by the police that it wasn't. Exactly, and that goes to the heart of what we, what our contention is on appeal. We believe that the district court judge in this case imputed a bunch of knowledge that was... But besides which, we're not dealing with a barricaded defendant here. We're dealing with two neighbors of his. Well, one neighbor of his at the moment. Yes, and let me say, of course, my... It's largely irrelevant what was going on with the barricaded or non-barricaded person, right? Excuse me? What was going on with the barricaded or non-barricaded person is of peripheral importance here. Well, I guess it depends on your definition of peripheral. What we were told when our, when my clients arrived was that Mr. White was barricaded in his house with his infant. He was refusing to come out. That Mr. White had relationships with neighbors in the, in the, on the block that were giving him, feeding him information. They were... They were specifically told that by whom? The second party, that they were giving him information. They were told that by the Henderson Police Department captain who was on scene. And they knew that how? I don't know how they knew that. That's one of the problems that, that, that we think that the district court aired here. Well, so how do you think it's even true? I mean, what information was there to give? I mean, what could they see that he couldn't see? Mr. Mitchell told, during his deposition, told exactly what he was telling Mr. White. He was telling Mr. White how his... There's a SWAT team out there. A SWAT team out there that was making tactical plans to enter the house. It would be important for Mr. White to know, and dangerous for the police officers involved, and maybe neighbors, to know when and how that was going to happen, what part of the house was going to be entered, at what time, whether one or more parts of that. I'm just, I'm just surmising here, but these are the things that are important. And why did he know any better than Mr. White while it was going on? He could, Your Honor, he could tell Mr. White exactly what he said. I would, I would, I think I would want somebody to tell me if my position was changing regarding anything involving the police. So he could give him the exact moment and point of entry on his house. That, that has to give the advantage to the barricade suspect. I mean, we, we know that SWAT teams operate in high risk, high volatility, dangerous situations in which the element of surprise is very important to them. They're going to lose the element of surprise if a neighbor is on the phone saying, hey, they're gathering outside your garage, that's where they're coming in, or they're gathering at your front door, that's where they're going to come in. This is what was known to the North Las Vegas Police Department. Is this a crime of some kind that they charge him with? Charge who with? I mean, what, what was the basis for going into his house? The basis for going into- What were they going to arrest him for? Obstructing a police operation. By, by giving this information? By giving this information, he was interfering with a police operation. You're saying vaguely suspected, but they didn't have any reason to. Well, vaguely is your word, Your Honor. I, they said they suspected that he was providing information to Mr. White. He later admitted that he was providing information to Mr. White. I, I think that goes to the reasonableness of the officer's interpretation of events. There- Can I ask you, is that the sole, that's the sole basis for the emergency here? It, it has nothing to do with, with the plaintiff being armed necessarily, right? Well, they didn't know he was armed until after, Your Honor, so- Right, so all you're relying upon in terms of there being an emergency was this concern that he was passing tactical information about the officer's tactical plans to Mr. White. And every, every example of his conduct in, in response to police requests- Well, hold on. Suggested that he was not going to cooperate. Okay, but the problem I think I have, my biggest problem with your position here is that there are disputed issues of fact as to what exact, what kinds of orders the plaintiff was given and whether in fact he was making some deliberate choice to refuse. He says that he never received any orders. The only thing I think he says he received was a request early on from the Henderson folks to, could, could they occupy his house, and he told them no. But after that, I think his position is that I never received any orders from the police. So it seems to me, we're not going to be able to affirm or, or to order the district court to grant your client summary judgment here. That's just going to be a factual issue that the jury will have to resolve. Well, Your Honor, he did, there, there's more than just that. Okay, yes, there are, there are parts in his complaint where he denies that he, that he got any orders. No, I'm talking about his complaint. I'm talking about his deposition. Well, in his deposition, he admitted that he received a phone call earlier in the day from Henderson in which they just asked him to talk to them about Philip White. He didn't respond to that. He admitted that he got a phone call later from the city of Henderson asking if they could occupy his house. That's why he didn't respond to that. He didn't see it until after his arrest. Well, that's what he said. Right. He answered every other phone call. Well, keep going, because none of those have anything to do with your clients. My clients. What I'm talking about are the orders they supposedly gave him to, I think, get away from the window, do this, do that, and he says, they never gave me any orders. I never had any communication with them. Or don't talk to White. At the EOR 449, at 216 of his deposition, he says, well, I may have, they may have said open the door, but I remember them saying resident 367, come to the door. That's obviously an order. And that's when they were battering the door down and he didn't want to get run over by them with the battering ram. So that I'm talking about before they didn't make the decision to enter the house. That's what you're relying upon is that supposedly they gave him commands that were related to basically try to get him to stop conveying this information to Mr. White. And he says, I never got any commands like that. The first thing, my first interaction with your clients was when they were about to batter my door down and I was afraid to go and even try to open it for them because they were already coming in. He. That's what he says. Maybe you guys have a different position, but that's for the jury to resolve. Well, my position then is that the orders that he was, he obviously has notice about what's going on in the neighborhood. He's obviously talking to Philip White. All he has to do is put his phone down. They told him to put his phone down, stop, get away from the window. He said that there was like 10 seconds when they came in. You mean when he came in or before that? When they, let's just say when they came in, because we know he got that order. That they immediately knocked him down. His phone fell down. He didn't have, they say he was still on the phone, but he says he wasn't. Well he says, this is what he says. Uh, so the three officers that broke in the door yelled multiple orders at the same time. Then I was shot under the arm. I know I was shot under the arm at that moment because my arm was elevated holding my phone. He was talking on his phone. I'm not sure if other shots hit me just then. Then I fell to the ground. He says in his deposition that he doesn't know. Well, he, he, he says he doesn't know if he stopped talking to his mother. He's talking to his mother. It turns out at that time, he doesn't know if he stopped talking to his mother when he, when he was on the ground and the phone was still by his head. So all I can, all I can say is, is that when the district court evaluated this case, they cited genuine issues of material fact that are clearly outside of the scope of the universe of knowledge that North Las Vegas had. You know, they, the district court judge, who I, who I greatly admire, I think it was a complicated case. The plaintiff's initial complaint had 30 something causes of action. I think it was a hundred and something pages long. I gather your position is that anything the Henderson police did is completely irrelevant at this point. I mean, for example, unless there's, he says that the Henderson, I guess it was the Henderson police wanted to come take us his, his apartment to, to use as a staging ground and he said no. He said he cited the Civil War. And that's why they got all upset. And he also says, and I think this is the, um, North Las Vegas police that, um, um, when he was arrested, um, said something like, why did you give us the finger? And, and, uh, as suggesting that, as he suggests in general, that their reason for arresting him was that he was taking pictures of them and, and, um, and being rude to them, which he did. I mean, I hear that in every case, Your Honor. The, the public generally, uh, has a vision of police officers that they're going to be offended by things like getting the finger. But he says he heard them say it. And, and maybe they did say it, but that's not why they went into his house. They went into his house because he was suspo- You don't think a jury might be able to infer otherwise? I don't think so, Your Honor. I mean, not with the knowledge that we had. I think he- He also says that they had, that they were, they had a gun on him when he was taking the pictures. That they had a, a, they were pointing a, a, a gun at him while he was taking photos. I, I, I can't say anything to that. And, uh, Detective Cawthorne did not, did not address that in his affidavit. Well, that's fine. So there's another disputed issue of fact. Only if it's material, right? Only if it's material. So- If it's not material, if they pulled a gun at him before they, while he was in his own house looking out? Not looking out, Your Honor. Taking photographs- Taking photographs. And talking on the phone. Okay. And relaying information to the barricade suspect, right? So this, this requires, and I know you know this, this requires an evaluation of the totality of the circumstances here. But only the totality of the circumstances known to the North Las Vegas Police Department. Not what was known to Henderson. Henderson later had an administrative investigation and blamed everything on their captain, right? Including our entry into this house. Blamed on their captain for creating an emergency that didn't really exist objectively. But in our heads, it did exist. In our heads, we have this guy who's saying, I'm not coming out, you gotta come in and get me. In our heads, we have this guy who's hit his wife earlier in the day and she's gone and called the police and she's afraid to go back in. In our heads, we have neighbors who are forwarding information to the suspect. Imagine how valuable that would be to a really bad person. In the record, is the notion that, the fact that your clients were told by the Henderson police that he was forwarding information as opposed to we think he might have. Oh no, well, maybe I'm overstating it. Suspected of providing information to the Philip White. I didn't mean to overstate that. Suspected of providing information to Philip White. You're not able to rely on the exigent circumstances exception. You're really relying more on what I guess is called the emergency exception, right? Because you don't have, your clients don't have probable cause to think he's committing an offense. We're relying on emergency. We're relying on the need to act. A reasonable officer would perceive the need to act to avoid. You have no probable cause, but we have to get in there right now. We have no time to go and get a warrant. I mean, that's crazy because there's imminent harm is going to be inflicted on someone, right? Precisely, that's how we argued it in our papers. Yeah, and I guess. The Brigham City case. Right, and maybe the concern with the safety of the infant in the other house, maybe that's a sufficient concern, but I guess what the problem I think I have with your position here, as I said, is that I think a jury could say that it was unreasonable, even if you thought there was an emergency, not to at least go and see if the guy would battering down the front door without giving him an opportunity to respond, and I think a reasonable jury assessing the facts in the light most favorable to him could say, even if you had all of the concerns you just expressed, I'm not saying they're not legitimate, that it was not reasonable within the meaning of the Fourth Amendment just to batter someone's door down without giving them an opportunity to even open it and talk to you guys. So what's wrong with that view? I guess the exigencies of the emergency component of the process, you know, I. You go up and knock on the door. The only person. Hold on. You go up and knock on the door. Sir, can you please get off the phone? We're concerned that you're doing this. And if the guy at that point doesn't cooperate, okay, well, maybe it's a new ballgame. But I'm saying you just, taking the facts in the light most favorable to him. I understand. You have this sort of suspicion not confirmed. I wouldn't even say you have reasonable suspicion to think, let alone probable cause to think that he's conveying information. Well, I disagree with that, Your Honor. I mean, look, what we have is the suspicion that's communicated to us by Henderson and then a bunch of corroborating observations, right? So the officers see the guy taking film and talking on the phone. The officers know that he wouldn't come out earlier. The officers know that, you know, they know that he wouldn't come out earlier. The only, as I understand it, the only not come out is they wanted to come into his house to use his staging. Is there any other not coming out? Well, I mean, look, this is the part of his testimony that I find the most troubling. And I get your point, Your Honor. I understand what he's going to say. But there's a point in his deposition, it's at the record of, it's at EOR 414 on page 74 of his deposition, where he actually is talking to what I think is a North Las Vegas police officer on the telephone. It's certainly an officer talking on the telephone. And this is what he says. And I know I'm almost out of time, so this will be a good way for me to end. I was in my garage photographing at the time I received a call. And I think I had snapped a photo right when, right when the call came through. And of course, since my camera is my phone, I could no longer take pictures while on the call. Then he says, but I could, I could view an officer in between my house and the neighbor's house. And he was on a cell phone holding down his shoulder mic while on the phone. Then he said, holding what? His shoulder mic, the police officer has this shoulder, I'm sorry, I'm looking down. So, and at some point during the call, I asked him, are you holding down your mic? And then he, the officer released his mic and looked around because he didn't know I was watching him or that I could see him. So what I, that's on page seven. It's on the EOR at 414, it's page 74 of his deposition. This is what they're dealing with there. Now you can say that he doesn't, he says things that he didn't hear, that he didn't receive, but he obviously- Did you, so is that testimony that somebody asked him to come out? I don't know what happened on that telephone call, Your Honor, but he was talking to the police about what was going on at Mr. White's. I see you have no evidence that anybody asked him to come out. He was asked to come out by the message that you said that he didn't, that he said he didn't receive until after, and he was asked to come out by the city of Henderson. He was asked to come out by our guys, but of course he says that he didn't receive those commands. Of course he did receive those commands. I'm reading that quote as evidence that he knew what he was doing the whole time, that he was actually asking, acting in a way that was escalating the situation. You're asking us and you're asking a district judge to resolve disputed facts. The reason for our appeal, Your Honor, is that the genuine issues of material fact that were actually cited by the district court are just not stuff that we knew. All right. Well, forget the district court, though. But, I mean, in other words, he- You can find other disputed facts. Of course you can. Exactly. Okay. But what I'm saying is that the ones that were so important to the court are not ones that- Wait a minute. I mean, we review it de novo. Exactly. But- Right. And therefore, if there are material issues of disputed fact, even if they're not the ones the district judge relied on, you still, we still affirm. Then I would say, yes, yes, that's a correct statement of the law. Then I would say that the disputed facts that you're finding are not genuinely disputed facts. Counsel, if we take the facts in the light most favorable to the plaintiff, then what does that do to your argument? If they're facts? I mean, I'm not going to concede that what Mr. Mitchell is saying are facts. Well, we have to. We have to take the facts. No. We do, for qualified immunity analysis. You have to take genuine facts. You have to take material facts. You don't have to take facts that no one would believe. Right? That's the Scott v. Harris point. Right? Irrefutable video, maybe. But no. That's your position. That holding has been extended past video. Right? But if he says- Go ahead. No reasonable jurors. If he says he didn't look at it, you say he got a voicemail. You say he didn't look at it until afterwards. I mean, certainly in my experience, I don't. First of all, his suggestion that the voicemail might not even have showed up at that point certainly consisted with my experience. And second of all, the fact that he didn't listen to it at the point is certainly not inherently unbelievable. So what are we supposed to do with that? Now, the jury can just believe it. I understand, Your Honor. You know, what I think is, is that if you look at the totality of the circumstances in this case, you'll find that Mr. Mitchell's selective description of what happened that day is not supported in the record. Not supported such that a reasonable juror would believe it. Okay. Thank you very much. The quote you were reading from, it's from the call where the Henderson police asked if they could occupy his house. That's a different quote. No. The part you were reading from. If you read about three more lines, you would see that he's talking about the earlier call. So I don't think, I just think what you represented was quite misleading in suggesting that it was some other call. He's only talking about the call where they asked to occupy his house. It's right there on page 75. Just keep reading a little bit further from where you were quoting. Well, I mean, he is talking. These are his affirmative statements. Are you holding down your mic? He said that. Keep reading a little bit further and he gives the exact quote. Can we occupy your house? And I told him no. So that's the call that he's talking about there. Okay. Thank you very much. We'll give you a minute in rebuttal. Thank you. Good morning. May it please the court. I'm Glen Caton on behalf of the appellee Anthony Mitchell. I think that the point that Judge Berzon and Judge Watford kept hammering is exactly the reason that this case should be dismissed, because in order to make the qualified immunity determination. What do you mean by dismissed? Because there's not a basis to appeal if the only thing to be decided are questions of fact. You mean the appeal should be dismissed, not the case. I'm sorry. If I said the case, I was really nervous. And you actually mean affirmed, not dismissed, I think. You think the district court should be affirmed. It's six one half dozen of the other. No, it isn't actually. It's a jurisdiction. Dismissed usually means lack of jurisdiction. Right. I thought that if there are only fact issues to be resolved, that the court actually lacks jurisdiction for an interlocutory appeal for qualified immunity. I see. So you were saying that this is really a dispute over the summary judgment itself. Right. Not a dispute about taking the plaintiff's answer to qualified immunity appeal, taking the plaintiff's facts. Right. Exactly, Your Honor. Right. And because the qualified immunity determination requires the resolution of the disputed issues of fact, either the appeal should be dismissed or the court's denial of summary judgment should be affirmed. Can counsel look at the facts in a light most favorable to the plaintiff and doing that determine whether or not the facts as relayed by the plaintiff reveals the violation of a constitutional right? We can do that. Yes, Your Honor. That's exactly right, Judge Rawlinson. And here, if we take the account of facts by Anthony Mitchell and draw the inferences that could be drawn in his favor, I think there's no question that the defendant's violated clearly established Fourth Amendment law. Was one of the facts that he was wearing body armor? He was wearing a Kevlar vest, he testified. A Kevlar vest. Yes. Body armor. And that was, I think, a very rational thing to do after a SWAT team pointed a rifle at him twice, which is what he testified to. So he testified that he only donned the body armor after the rifles were pointed  Exactly. And the fact that Mr. Franklin was a SWAT team who pointed at him. One problem here is distinguishing between the two police departments. Who was the SWAT team? Was it the Henderson? Well, the defendants, the appellants in this case are definitely SWAT officers. But North Las Vegas. From North Las Vegas. I believe there was a city of Henderson SWAT team there as well, but that they asked for backup in addition to the regular patrol. Does he know which switch? He did. And he testified. For example, who pointed the gun at him? Yes, Your Honor, and that's at Page. He testifies that based upon the fact that they were standing next to a vehicle with the North Las Vegas name on it, that he believed that it was the, yes, it's at 238 of the record. North Las Vegas SWAT was on the truck that the officers were standing by when they pointed the rifle at him. Which, as Judge Berzon identified, is itself not only a use of force, but this court has repeatedly found it to be a high level of force in both the Espinosa v. City and County of San Francisco case and in the Robinson v. Solano County. So at this point, all they know is he's taking pictures and filming and they're pointing a rifle at him. Well, they suspect that he's sending these pictures to White. Well, all that they – certainly all that they know is that he is taking pictures and I'd be very happy that he's taking pictures and possibly video. And I do want to – But does the record suggest why it is that he would have a better view of what was going on than White did? No. In fact, the record indicates, Mr. Mitchell states under oath, that he could not even see Mr. White's house from his home. So he had no ability – I mean – But that's not relevant. I mean, it could be that the SWAT team people were in front of his house, not in front of White's house, and that might be the explanation. But I just wonder, you know, where the suspicion came from in the sense that, you know, in general, I would think whatever he could see, White could see, but maybe that's not true because of the configuration. So I wonder if the record shows you anything about that. The record indicates that there were numerous outdoor cameras at the White residence. So in all likelihood, Mr. White knew far better than Mr. Mitchell what was going on outside of his house. In terms of the suspicion that Mr. Mitchell was communicating important information to Mr. White, I don't know where that comes from either. I do know that the affidavits of the North Las Vegas officers, which are at 351 and 392 of the record, make very clear that it is only sort of a hunch or suspicion. In the Cawthorn affidavit, it says that he was informed that the Henderson PD believed that both the 362 and 367 Eveningside residents were in contact with White. Well ---- If they conveyed that to the North Las Vegas SWAT team, then the North Las Vegas SWAT team was entitled to rely on that in their actions, weren't they? Well, I guess it depends on what the actions are. And I think that ---- Well, were they entitled to rely upon information that was relayed to them by the Henderson Police Department? I think so, of course. I think it would be very reasonable to rely on information that was conveyed. I think the question here is whether a reasonable officer would have taken the information that was provided, which is that one officer said that a lieutenant from Henderson said that they were possibly providing tactical information. And I think that it would occur to any reasonable officer, exactly the first thing that Judge Berzon asked Mr. Freeman, is how would they know that? Like, I don't think it takes any specialized detective attenuated. Like, basically, if someone says, hey, Mr. Mitchell is probably communicating with Mr. White, before I take the battering ram to his door, I might ask, well, how could we know that? Is there a stingray? I mean, there's nothing in the record to show that anyone knows that. So they make, just like they say that this is a barricaded hostage situation. There was never a hostage. There was never a threat to the baby. The only barricade were the police officers putting up, cordoning off the block. And I guess I think that they can rely on the information, but to do what? To do a stop and frisk? To do a knock and talk? I don't think that the conclusory statement that this is a barricaded hostage situation justifies knocking down someone's front door and shooting them with pepper balls. Well, I think your position or your client's position depends really on the conflict over whether he was given orders to do certain things before they decided to force entry. Because if he had been given the orders that the officers described and he was acting in a way that suggested, no, no, he is deliberately being uncooperative, we have every reason to believe that what we were told about the communications going back and forth happens to be true, I think it's a totally different case. I think your opponent quite articulately laid out why officers in this situation, who at least in their own mind were thinking that we need to potentially save the life of an infant, that there's not time just to dilly and dally like we get to do up here, you know, with 20-20 hindsight. But I think that, to me, is the key point, is that your client says, I never got any order, so I wasn't even in a position to resist or, you know, or obstruct. So two things to that. Most directly, Judge Watford, I think you're exactly right. Mr. Mitchell says under oath that he never received a command. I believe he actually says at one point because they swayed the right – the right to force, to get away from the window. He understood they were telling him to get away from the window. But in terms of a lawful command, they certainly never did what Your Honor suggested and knocked on the door and said, look, we need to be sure that you're not compromising our operation, hand over your phone or we're going to have to – whatever. We have reasonable suspicion. There's a million things that they could have done short of banging down his door. Kagan. What was on his voicemail that he says he didn't get? I apologize that I don't remember exactly what it was. I mean, was it in the nature of the sort of order we're talking about or not? It was something along the lines of I'm Officer Detective so-and-so and we need to – we want to speak to you about Mr. White. Oh, I see. Okay. But even that didn't say come out or something? I will check the record. I mean, I can send a follow-up letter. But I'm 99 percent sure even – Or drop the phone or anything like that. But frankly, Your Honor, since he testified and it's, as Your Honor said better than I was planning on articulating it, it's hardly incredible when he testifies that he did not receive the voicemail until after the incident. All they know is that voicemails on my phone pop up at odd times. I don't think anyone who's had a cell phone can say that they have received every message in a timely manner or necessarily looked at it. With all that was going on, even if a little pop-up that he had a voicemail popped up, which he – which he says just the opposite. Not only that, but I spent a half hour this morning trying to figure out why my phone doesn't ring, which it doesn't. So, yes, Judge Watford. These – he was never – he never disobeyed a lawful command. In fact, his testimony was that the officers were 40 to 60 feet away from his home. He's inside the home. How can they give him a lawful command? But that's all something for the jury to sort out, because the officers, of course, have a different version of events. I absolutely agree. I mean, it may be that a jury discredits his testimony, says we believe that I still – there's still, frankly, nothing in the record to explain how the officers could give a command from 40 to 60 feet away when they're not talking to him on the phone, and he's inside the house, and they don't say they have a phone call. Maybe they dispute they were 40. We just don't know what the officers are going to say. Fair enough. I'm not going to argue with you, Your Honor. That's exactly right. And that there are – I mean, basically, all of the facts that the appellants Can we at least worry about the qualified immediate – the second stage of this? Sure. Well, so I cited the two cases that pointing a weapon is a high level of force clearly established as of the time of this incident for excessive use of force of the – shooting him three times with pepper balls, forcefully dropping their knees into his back and shoving his face into a stucco wall. And you would say that's sort of regardless of whether they had reason to come in and batter down the door? Yes, Your Honor. I think there's an excessive use of force, even if there was not the Fourth Amendment violation of battering down his door, because he said it was within a second, less than a second of when they beat down the door, that he was shot with pepper balls. Right. But that, again, it's the exact same issue with the Fourth Century, is that if you believe the officer's version of events, they entered, said three times, you know, with space in between, get off the phone, drop this, do whatever, and he was deliberately disobeying their orders and they had no choice but to use force to subdue him. But, again, if you credit your client's version, then, right, he had no time to even react. He just shot him right when he entered. Yes. I think that's exactly right, Judge Wofford. And I'm operating under the assumption that this Court is going to credit his testimony. He certainly – I don't know where Mr. Freeman was going with this idea that, you know, if there's something contradicted by video or he says something that's so ridiculous, like I jumped over the house and I was in the backyard, then you might say, well, we're not going to – we're going to assume that that's not true. There's nothing that even approaches that. I think all of his testimony that is inconsistent with the appellant's testimony is eminently reasonable and it's for the jury to decide. On the issue of – the same thing is true of whether they had probable cause to arrest. All they knew was that he was photographing and he gave them the finger. They didn't know – they didn't have – I agree that it was probably not even reasonable suspicion. It certainly was not probable cause to arrest. So that's a violation of the Fourth Amendment. There are a few cases, and in particular, one that Judge Brezan authored for the Court, I think it was back in 2010, the Struckman case, that – and we have not emphasized just how heavy a burden it is for police to justify a warrantless forced entry into a home. And the Supreme Court and this Court have emphasized that the main purpose for the Fourth Amendment, the chief evil against which the wording of the Fourth Amendment is directed, is physical entry into the home. Numerous cases say that in order to – well, first of all, we have the issue of, you know, Judge Wofford mentioned, well, we have time to dilly and dally and consider this. Well, they didn't. Well, in fact, they did and they did call the city attorney's office and they did have a debate about whether there was probable cause to break down the door.  That was earlier, before – I thought that was before the North Las Vegas case. I think it was, but the point is that there was nothing – there was no escalation of a problem from the time that they were calling to get legal advice. They could have called a judge to get a warrant and said – explained all the circumstances and then, hey, if a judge says I'm worried about this whatever, then they got your warrant and you've got your ticket, not 100 percent, but pretty much your ticket out of the home. But your position, presumably, is they would have gotten the warrant. I can't imagine they would have gotten the warrant. Maybe not. But the point is they had time to – they had time to get one and the U.S. v. Alvarez case that's cited in the Stafford case, that appellant's site, says that the burden is on the – is on the police to show that a telephonic warrant was either unavailable or impracticable. They have not met that burden. There was nothing stopping them from calling to try and get a telephonic warrant. They did not have specific and articulable facts. They just keep repeating this hostage and barricade, but they didn't have specific and articulable facts. The time is up. Thank you very much. Thank you, Your Honor. I have one minute to rebuttal if you want it. But you don't need to take it. Thank you. Thank you very much. The case of United – of Mitchell v. Chronister is submitted. We'll go to First Amendment Coalition v. Wright, and we'll then take a short break. We'll be right back.
judges: Berzon, Rawlinson, Watford